[This opinion has been published in *Ohio Official Reports* at 80 Ohio St.3d 202.]

FREEDOM ROAD FOUNDATION, APPELLEE, *v*. OHIO DEPARTMENT OF LIQUOR CONTROL, APPELLANT.

[Cite as *Freedom Road Found. v. Ohio Dept. of Liquor Control*, 1997-Ohio-346.]

*Crimes—Gambling—R.C. 2915.02(D) permits participation in the operation of a charitable organization's scheme of chance on liquor-permit premises by owners and/or their employees, when.*

R.C. 2915.02(D) permits participation in the operation of a charitable organization's scheme of chance on liquor-permit premises by premises owners and/or their employees, so long as neither owners nor employees are compensated for their participation.

(No. 96-1006—Submitted May 21, 1997—Decided November 5, 1997.)

APPEAL from the Court of Appeals for Franklin County, No. 95APE08-1030.

———————————

{¶ 1} Plaintiff-appellant, Freedom Road Foundation ("Freedom Road"), is a charitable corporation and nonprofit educational entity that is classified as an exempt charitable organization under Section 501(c)(3) of the Internal Revenue Code. Freedom Road filed a declaratory judgment action in the Franklin County Court of Common Pleas seeking a declaration that R.C. 2915.02(D) authorizes its method of conducting charitable fundraising activities involving schemes of chance in liquor-permit premises. In addition to the declaratory judgment, Freedom Road sought a temporary restraining order and preliminary and permanent injunctions to enjoin the Ohio Department of Liquor Control from issuing citations based on those fundraising activities.

{¶ 2} Freedom Road uses liquor-permit-premises owners and employees as volunteers for the organization to sell and redeem "tip tickets" on the liquor-permit

premises. Tip tickets are similar to Ohio Lottery instant winner games in that a limited number of tickets contain a hidden winning symbol and may be redeemed for a cash prize. Typically, Freedom Road employees supply permit premises with a bag of tip tickets. Each ticket is sold for one dollar, and a predetermined amount of the gross proceeds from ticket sales is paid out in cash prizes. Of the net proceeds, one hundred percent is paid to Freedom Road.

{¶ 3} The dispute arose because the Liquor Control Department cited several of the permit-premises owners under its Regulation 53, Ohio Adm.Code 4301:1-1-53, for sale of Freedom Road tip tickets. The citations were necessarily based on the department's interpretation that R.C. 2915.02 had been violated, as the regulation authorizes the sale of schemes of chance in liquor-permit premises "so long as there is strict compliance with division (D) of section 2915.02 of the Revised Code." Ohio Adm. Code 4301:1-1-53(D) .

{¶ 4} As the litigation progressed, the central issue became whether Freedom Road "conducted" the tip ticket operation, as required by R.C. 2915.02(D)(1). That issue turned on whether the statute allowed permit-premises owners and their employees to act as volunteers for Freedom Road by selling the tip tickets to tavern patrons and redeeming winning tickets out of the sale proceeds and whether, under Freedom Road's scheme, owners or employees were compensated for their participation. The trial court concluded that compensation received by permit-premises employees for their duties as tavern employees could not be separated from their volunteer services rendered for Freedom Road and ruled that their conduct violated R.C. 2915.02. The court of appeals reversed, concluding that the record contained insufficient evidence to support that finding.

{¶ 5} The cause is now before the court upon the allowance of a motion to certify the record.

_____

*Schottenstein, Zox & Dunn Co., L.P.A.,* and *John A. Gleason*, for appellee.

*Betty D. Montgomery,* Attorney General, *Chester T. Lyman, Jr.*, and *Simon B. Karas,* Assistant Attorneys General, for appellant.

_____

**COOK, J.**

I

FREEDOM ROAD'S REQUEST FOR DECLARATORY

JUDGMENT IS PROPER

{¶ 6} The department initially argues that the trial court never should have reached the merits of the declaratory judgment action because Freedom Road lacks standing to challenge the department's actions. The department's argument is based on the fact that Regulation 53 has been enforced against liquor-permit premises, not Freedom Road. The department states that it, in fact, has no authority to regulate the activities of charitable organizations such as Freedom Road. Accordingly, the department argues that only permit-premises owners have standing to challenge the citations.

{¶ 7} By requesting a declaratory judgment, however, Freedom Road is not directly challenging any particular administrative order of the department. Freedom Road would have no standing to make such a challenge. Instead, Freedom Road seeks judicial construction of R.C. 2915.02(D). Judicial construction of R.C. 2915.02(D), while having no direct effect on the department's administrative orders, will resolve whether the department has correctly interpreted that statute in finding a violation under Regulation 53.

{¶ 8} The Declaratory Judgment Act allows "[a]ny person * * * whose rights, status, or other legal relations are affected by a * * * statute [or] rule * * * [to] have determined any question of construction * * * arising under such * * * statute [or] rule * * * and obtain a declaration of rights, status, or other legal relations thereunder." R.C. 2721.03. Because (1) this action is within the scope of the Declaratory Judgment Act, (2) a justiciable controversy exists between adverse

parties, and (3) speedy relief is necessary to preserve rights that may otherwise be impaired or lost, Freedom Road's request for a declaratory judgment is proper. Compare *Burger Brewing Co. v. Ohio Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 96-100, 63 O.O.2d 149, 150-152, 296 N.E.2d 261, 263-266.

II

SUBSTANTIVE ISSUES BEFORE THE COURT

{¶ 9} The remaining issues before the court involve interpretation of R.C. 2915.02(D). The first issue requires an analysis of whether Freedom Road "conduct[s]" the tip ticket operation, as required under R.C. 2915.02(D)(1). The second issue involves the question of whether permit premises owners or their employees derive a benefit prohibited by R.C. 2915.02(D) from their participation in otherwise lawful tip ticket operations.

A

FREEDOM ROAD CONDUCTS THE FUNDRAISING ACTIVITY

{¶ 10} Analysis of the statutory terms chosen by the General Assembly to identify the potential actors under R.C. 2915.02(D) resolves the issue of what the General Assembly meant by its requirement under R.C. 2915.02(D)(1) that legal schemes of chance be "conducted" by charitable organizations. R.C. 2915.01(T) defines "conduct" as follows: " 'Conduct' means to back, promote, organize, manage, carry on, or prepare for the operation of a scheme or game of chance * * *."[1] Because these verbs are listed in the disjunctive, a charitable organization conducts the scheme or game of chance when it executes *any* of the actions listed.

---

1. We note that the term "conduct" is used elsewhere in R.C. 2915.02, both as a noun and as a verb that, in context, must be given a narrower construction than that given in our opinion. For instance, R.C. 2915.02(A)(1) prohibits persons from engaging in "conduct" that facilitates bookmaking and R.C. 2915.02(D)(2)(e) prohibits otherwise legal games of chance that are "conducted" during, or within ten hours of, a bingo game held pursuant to R.C. 2915.12. Nevertheless, in construing the verb "conducted" in R.C. 2915.02(D)(1) as requiring a level of action below which an otherwise lawful scheme of chance becomes unlawful, we must construe any ambiguity in that term strictly against the state and liberally in favor of the defendant. R.C. 2901.04(A).

**{¶ 11}** A corollary of the legislature's use of the disjunctive "or" in defining the types of actions subsumed in the broader concept of "conducting" a scheme of chance is that a charitable organization may conduct a scheme of chance despite the fact that owners and/or employees of permit premises actually "carry on" that activity. In fact, R.C. 2915.02(D) contemplates operation or assistance in the operation of a scheme or game of chance by persons other than the charitable organization, merely prohibiting such persons from being compensated for that activity.

**{¶ 12}** "Operate," while not expressly defined in R.C. Chapter 2915, connotes performance of an activity, while the verbs used to define "conduct" would allow a charitable organization to delegate operation of the activity, while retaining a supervisory or organizational role. See, *e.g.*, Webster's Third New International Dictionary (1986) 1580-1581 (defining "operate"); see, also, R.C. 2915.01(U) (defining a "bingo game operator" as one who carries out any of the bingo gaming functions). Accordingly, the permit-premises owners' operation or carrying on of Freedom Road's tip ticket activities does not prevent Freedom Road from "conducting" the scheme of chance, as required by statute.

B

OWNERS AND EMPLOYEES ARE NOT COMPENSATED

FOR OPERATING THE FUNDRAISING ACTIVITY

**{¶ 13}** R.C. 2915.02(D) states that "[n]o person shall receive any commission, wage, salary, reward, tip, donation, gratuity, *or other form of compensation*, directly or indirectly, *for operating or assisting in the operation of*

---

Accordingly, even if we were to conclude that the definition of "conduct" found at R.C. 2915.01(T) is inapplicable to that term's use in R.C. 2915.02(D)(1), we nevertheless would be confined to construing that term within its context in connection with its common usage. R.C. 1.42. The common usage of "conduct," when used as a verb, connotes management, control, or the giving of direction. See, *e.g.*, Webster's Third New International Dictionary (1986) 474. Accordingly, even without reference to R.C. 2915.01(T), our conclusion would be the same.

*any scheme or game of chance*." (Emphasis added.) Appellant argues that this provision prevents permit-premises owners and employees from participating in on-premises tip ticket operations. The evidence on the issue demonstrates that neither permit-premises owners nor their employees are paid for operating the fundraising activity and that all of the net proceeds from the activity are paid to Freedom Road. Further, the department failed to produce any evidence that permit-premises owners or their employees receive anything in the nature of compensation for operating the fundraising activity.

{¶ 14} Appellant argues that permit holders and their employees necessarily receive an impermissible "benefit" from any increased patronage that results from the sale of Freedom Road tip tickets in their establishments. Although the department produced no evidence regarding the effect of tip ticket sales on patronage at trial, Freedom Road's president, Lindy Douglas, acknowledged in her deposition testimony that sales of tip tickets allow participating permit premises to keep customers who otherwise might go elsewhere to engage in gambling.

{¶ 15} In interpreting a statute, we must begin by examining its express terms. The statute itself does not expressly prohibit one who operates or assists a scheme or game of chance from deriving any *benefit* from that activity. Instead, the statute carefully sets out a list of the types of *compensation* that such persons are forbidden from receiving. None of the listed forms of compensation may be received "for operating or assisting in the operation of a scheme or game of chance." The statute thus contemplates a *quid pro quo* — the receipt of something of value for the giving of another. The benefit of increased patronage, on the other hand, does not come in the form of compensation and therefore is not within the prohibited class.

{¶ 16} We conclude that the benefit of increased patronage does not fall within the prohibited class of compensation listed in R.C. 2915.02(D). Thus, there

is nothing in the evidence to remove the scheme of chance from R.C. 2915.02(D)'s exception to that section's general prohibition against gambling.

## III

## FREEDOM ROAD IS NOT ENTITLED TO THE

## INJUNCTIVE RELIEF THAT IT SEEKS

{¶ 17} Along with a declaration of its rights under statute, Freedom Road requested that the court "temporarily, preliminarily and permanently enjoin the Department, its agents, employees and anyone acting in active concert or participation with it, from issuing citations as a result of Freedom Road's charitable fundraising activities on permit premises throughout the State of Ohio."

{¶ 18} There may be any number of reasons not addressed in this action that would authorize the department to cite the permit holders under its Regulation 53. Our analysis is necessarily restrained by the limited evidence presented by the parties to this action. Accordingly, it would be improper to grant the broad injunctive relief requested by Freedom Road.

## IV

## CONCLUSION

{¶ 19} For all of the foregoing reasons, we affirm, in part, the decision of the appellate court. We reverse that portion of the appellate court's decision ordering remand and issue a declaration that R.C. 2915.02(D) permits participation in the operation of a charitable organization's scheme of chance on liquor-permit premises by premises owners and/or their employees, so long as neither owners nor employees are compensated for their participation.

*Judgment accordingly.*

RESNICK and F.E. SWEENEY, JJ., concur.

DOUGLAS, J., concurs in the syllabus and judgment only.

MOYER, C.J., PFEIFER and LUNDBERG STRATTON, JJ., dissent.

———————————

**MOYER, C.J., dissenting**.

**{¶ 20}** I respectfully dissent from the majority's conclusion that the record before us demonstrates that Ohio liquor permit owners or employees who participate in Freedom Road's tip ticket scheme of chance as described by Freedom Road's president are not "compensat[ed], directly or indirectly, for operating or assisting in the operation of any scheme or game of chance" as prohibited by R.C. 2915.02(D). Moreover, for the reasons which follow, I believe that the court of appeals correctly ordered a remand of this cause for further proceedings.

I

R.C. 2915.02 and Regulation 53[2]

---

2. R.C. 2915.02 states:

"(A) No person shall do any of the following:

"* * *

"(2) Establish, promote, or operate or knowingly engage in conduct that facilitates any scheme or game of chance conducted for profit[.]

"* * *

"(D) This section does not apply to any of the following:

"(1) *Schemes of chance conducted by a charitable organization* that is * * * [a recognized 501(c)(3) organization], provided that all of the money or assets received from the scheme of chance after deduction only of prizes paid out during the conduct of the scheme of chance are used by, or given, donated, or otherwise transferred to, any [recognized 501(c)(3) organization], and provided that the scheme of chance is not conducted during, or within ten hours of, a bingo game conducted for amusement purposes only pursuant to section 2915.12 of the Revised Code[.]

"(2) * * *

"No person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any scheme or game of chance.

"(E) Division (D) of this section shall not be construed to authorize the sale, lease, or other temporary or permanent transfer of the right to conduct schemes of chance or games of chance as granted by division (D) of this section, by any charitable organization that is granted that right." (Emphasis added.)

Ohio Adm.Code 4301:1-1-53 ("Regulation 53") states:

"(B) No person authorized to sell alcoholic beverages shall have, harbor, keep, exhibit, possess or employ or allow to be kept, exhibited or used in, upon or about the premises of the permit holder any gambling device * * * which is or has been used for gambling offenses * * *.

"* * *

"(D) This rule * * * shall not prohibit the conducting of schemes of chance * * * by charitable organizations * * * so long as there is strict compliance with division (D) of section 2915.02 of the Revised Code."

**{¶ 21}** I am unable to concur in the conclusion of the majority that R.C. 2915.02(D) includes an element of a *quid pro quo* between the charitable organization itself and permit holders or permit holder employees who sell Freedom Road tip tickets. The last sentence of R.C. 2915.02(D) provides, "No person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, *directly or indirectly*, for operating or assisting in the operation of any scheme or game of chance." (Emphasis added.) This broad, inclusive language should be construed as it was intended so as to proscribe the receipt of any pecuniary benefit flowing to a person based on operation or assistance in a scheme of chance.

**{¶ 22}** Lindy Douglas, Freedom Road's president, testified that permit holders benefit from selling the tip tickets in that sale of the tickets "keep[s] the customers in their bars" who otherwise might leave to engage in gambling at "the Eagles, Elks or Moose lodges or American Legions." This evidence demonstrates that permit holders indirectly received a pecuniary benefit in the form of increased patronage, *i.e.*, increased income, as a result of the sale of tip tickets on their liquor establishment premises. In my view, a bar owner who increases profits as a result of offering on-premises charitable gambling thereby indirectly receives a form of compensation for operating or assisting in that scheme. Thus that permit holder falls within the proscription of the quoted last sentence of R.C. 2915.02(D). Inclusion of a direct *quid pro quo* requirement unjustifiably diminishes the language "direct *or indirect*" within the prohibition in R.C. 2915.02(D). I believe Douglas's testimony is sufficient to support the conclusion of the trial court that R.C. 2915.02(D) was violated by the sale of tip tickets.

**{¶ 23}** Moreover, if selling Freedom Road tip tickets is an express or implied employment duty of permit holder employees, then those employees are in fact compensated for their assistance in operating the scheme of chance when they receive their pay from their employer.

**{¶ 24}** Freedom Road itself acknowledged that its tip ticket system constituted a scheme of chance as defined in the Revised Code ("a lottery, numbers game, pool, or other scheme in which a participant gives a valuable consideration for a chance to win a prize." R.C. 2915.01[C].). R.C. 2915.01(E) defines "scheme or game of chance conducted for profit" as "any scheme or game of chance designed to produce income for the person who conducts or operates the scheme or game of chance * * *." R.C. 2915.02(A) provides, "No person shall * * * (2) [e]stablish, promote, or operate or knowingly engage in conduct that facilitates any scheme or game of chance conducted for profit." Thus, were Freedom Road not able to invoke the charitable organization exemption provided by R.C. 2915.02(D), its scheme of chance would clearly be illegal.

**{¶ 25}** However, Freedom Road, as a charitable organization, could legally conduct a tip ticket scheme of chance pursuant to R.C. 2915.02(D). Thus, it arguably could itself conduct a scheme of chance on liquor control premises by using its own volunteers to approach liquor premises patrons and solicit them to purchase the tip tickets.

**{¶ 26}** If, however, permit-premises employees were selling tip tickets not because they desired to volunteer a service for Freedom Road, but instead because selling the tickets was an express or implied duty of employment assigned for the purpose of increasing the income of the liquor establishment, then the employees would not be volunteers. I agree with the court of appeals that the record is insufficient to indicate whether the persons selling tip tickets were acting as employees of the permit holders or as volunteers.

**{¶ 27}** If it is true that those employees were not true volunteers, the employer permit holder directing their activities would itself be "conducting" the tip ticket scheme, and the scheme of chance would not be solely "conducted by a charitable organization" as required by R.C. 2915.02(D)(1), nor would the permit holder qualify for the statutory charitable organization exemption. Instead, the permit holder

conducting the scheme would be committing a gambling offense in violation of R.C. 2915.02, and possession of the tip tickets on liquor premises would therefore fall within the proscription of Regulation 53. See, also, R.C. 2915.02(E), which prohibits a charitable organization from transferring its right to conduct a charitable scheme of chance.

{¶ 28} In determining whether permit holders themselves "conduct" the tip ticket scheme at issue, we look to R.C. 2915.01(T), where that term is defined in an inclusive manner to include backing, promoting, organizing, managing, carrying on, or preparing for the operation of a scheme or game of chance. Moreover, R.C. 2915.01(E) defines "scheme or game of chance conducted for profit" to include any such scheme "designed to produce income" for the person who conducts or operates the scheme or game.

{¶ 29} It is possible for more than one legal entity to be deemed to be "conducting" a single scheme of chance, and the testimony of Douglas shows that such a circumstance may well have existed in this case. The evidence in this case shows that Freedom Road itself did little more than periodically drop off new tip ticket supplies and pick up proceeds. On this record, in which Freedom Road's supervision of actual day-to-day sales of tip tickets was minimal at best, I conclude that the evidence could support a conclusion that permit holders themselves illegally conducted, *i.e.*, backed, promoted, organized, managed, carried on, or prepared, a scheme of chance for their own profit, and not for altruistic or charitable motives, whether or not Freedom Road also may be deemed to have conducted the scheme.

{¶ 30} It is appropriate to mention the scale of the tip ticket scheme at issue here. Douglas testified that, prior to 1994, tip ticket sales had generated revenues totaling as much as $40,000 a week from sales in nearly three hundred fifty liquor establishments. It is doubtful that the General Assembly intended to authorize a largely unregulated gambling scheme of this magnitude when it adopted the charitable organization exemption provision found in R.C. 2915.02(D).

II

Disposition

{¶ 31} Even assuming that the proposition of law set forth in the syllabus is correct, I do not believe that it is fully dispositive of the action before us. Rather, I would affirm the court of appeals' remand of this cause for further proceedings.

{¶ 32} Unfortunately the combined decision and judgment entry issued by the trial court is ambiguous as to whether the court intended thereby to award a declaratory judgment or, rather, to deny a declaratory judgment and issue findings of fact and conclusions of law justifying that denial. The caption to its decision reads "Decision and Entry *Denying* Plaintiff Freedom Road Foundation's *Request for Declaratory Judgment* and Permanent Injunctive Relief Filed on October 19, 1994." (Emphasis added.) The trial court expressly stated in the body of its opinion that "Freedom Road's requests for a declaration and an injunction are DENIED."

{¶ 33} Nevertheless, the opinion included findings of fact and conclusions of law, which might, in a general sense, be deemed declarations of law. Clearly, however, the trial court refused to grant Freedom Road the declaratory judgment it sought, that being a declaration that "its charitable fundraising activities are in compliance with R.C. 2915.02 and Regulation 53."

{¶ 34} In either event, my review of the record leads me to conclude that the trial court entered final judgment adverse to Freedom Road based solely on its determination that participating permit owners/employees were not volunteers. It failed to discuss numerous other arguments the department had made, apparently deeming them to be moot, as to why the best exercise of the trial court's discretion would be complete denial of declaratory judgment. Among those arguments were contentions that no true case or controversy existed between the parties and that issuance of a declaratory judgment was precluded by *res judicata* and estoppel doctrines. Moreover, I note that R.C. 2721.12 provides, "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would

12

be affected by the declaration." Even assuming, *arguendo*, that a dispute subject to resolution through declaratory judgment existed between Freedom Road and the department as to whether or not Freedom Road's actions were legal, it is clear that the interests of participating liquor permit holders were also very much at issue. Yet they were not joined as parties in the case at bar.

{¶ 35} The requirement of R.C. 2721.12 that all persons who will be affected by a declaratory judgment are to be joined as parties has been held to be a substantive jurisdictional requirement. *Bretton Ridge Homeowners Club v. DeAngelis* (1988), 51 Ohio App.3d 183, 555 N.E.2d 663. Under existing Ohio precedent, Freedom Road's failure to join statutorily mandated parties in and of itself would have justified the trial court in refusing to enter declaratory judgment.

{¶ 36} In view of the majority's rejection of the sole basis for the trial court decision, I believe the trial court should be given the opportunity to consider the department's remaining arguments against entry of declaratory judgment. In effect, the majority has itself determined that a declaratory judgment should be issued, has formulated the terms of that declaratory judgment and has incorporated that declaration into syllabus law. The majority thereby encroaches upon the principle that issuance or denial of declaratory judgment is committed in the first instance to the sound discretion of the trial court, reversible only upon demonstration of an abuse of that discretion or error of law.

{¶ 37} I do not believe the court was bound to issue a declaratory judgment at the conclusion of the trial. As noted in 2 Anderson, Actions for Declaratory Judgments (1951) 919-920, Section 383, "there is a distinction between the jurisdiction of a court to grant declaratory relief and the exercise of discretion pursuant to that jurisdiction. * * * [T]he final exercise of the court's discretion either to declare rights and legal relations of the parties, or to decline to pronounce a declaratory judgment, cannot be anticipated in advance of the development of the proof." Thus, even where a justiciable controversy exists, declaratory judgment may be refused if,

in the exercise of a sound discretion, it appears that the determination is not proper under all of the circumstances.  *Id.*  On the record established in this case, the trial court might well yet determine it appropriate to deny declaratory judgment if given the opportunity.

{¶ 38} For the foregoing reasons I would affirm the judgment of the court of appeals and remand the cause to accord the trial court the opportunity to reconsider whether to issue a declaratory judgment .

PFEIFER and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

_____